# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00664-COA

**ANTHONY TERRELL BOOKER A/K/A**               **APPELLANT**
**ANTHONY BOOKER A/K/A ROBERT BOOKER**

**v.**

**STATE OF MISSISSIPPI**                                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2018 |
| TRIAL JUDGE: | HON. DALE HARKEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: STACY L. FERRARO |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LADONNA C. HOLLAND JEFFREY A. KLINGFUSS |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 09/03/2019 |
| MOTION FOR REHEARING FILED: | 02/25/2020 - GRANTED; AFFIRMED - 04/05/2022 |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

## MODIFIED OPINION ON MOTION FOR REHEARING

¶1.     The State's motion for rehearing is granted based on the Mississippi Supreme Court's decisions in *Wharton v. State*, 298 So. 3d 921 (Miss. 2019), and *McGilberry v. State*, 292 So. 3d 199 (Miss. 2020), and this Court's decision in *Martin v. State*, 329 So. 3d 451 (Miss. Ct. App. 2020), *cert. denied*, 329 So. 3d 1201 (Miss. 2021).  The previous opinion of this Court is withdrawn, and this opinion is substituted in its place.  The judgment of the circuit court is affirmed.

¶2. In 2002, Anthony Booker and his friends robbed Dorian Johnson and beat him to death. Booker was sixteen years old at the time. Following a jury trial, Booker was convicted of capital murder and sentenced to a term of life imprisonment without eligibility for parole. Booker's conviction and sentence were affirmed by this Court and the Mississippi Supreme Court, and the United States Supreme Court denied certiorari. *Booker v. State*, 5 So. 3d 411 (Miss. Ct. App. 2008), *aff'd*, 5 So. 3d 356 (Miss. 2008), *cert. denied*, 558 U.S. 1150 (2010).

¶3. In 2013, the Mississippi Supreme Court granted Booker leave to file a motion for post-conviction relief (PCR) in the circuit court based on the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). The circuit court subsequently entered an agreed order vacating Booker's sentence and setting the case for a hearing pursuant to *Miller*. Following an evidentiary hearing, the circuit court held that Booker's original sentence was not unconstitutional and denied Booker's request to be resentenced to a term of life imprisonment with eligibility for parole. Accordingly, Booker remains under a life sentence and ineligible for parole.

¶4. On appeal, Booker argues that the decision of the circuit court must be reversed because (1) he has a statutory or constitutional right to be resentenced by a jury; (2) the circuit court was required to make a specific finding of fact that he is "permanently incorrigible"; (3) "the circuit court applied the wrong legal standard and failed to properly assess the *Miller* factors"; (4) "he was deprived of an opportunity to be heard on the central issue of his capacity for rehabilitation"; (5) the attorney who represented him in the circuit

2

court provided ineffective assistance; (6) a sentence of life without parole is unconstitutional in the case of an "intellectually disabled" defendant who committed a murder while being a minor; and (7) a sentence of life without parole is "categorically" unconstitutional in all cases in which the defendant committed a murder while being a minor. For the reasons explained below, we conclude that these claims are without merit and that the judgment of the circuit court must be affirmed.

## FACTS AND PROCEDURAL HISTORY

¶5. This Court summarized the facts of Booker's crime in our opinion on direct appeal:

> On December 30, 2002, Booker, Shawn Davis, Mary Scarborough, and Desmond Shields were involved in the beating death of Dorian Johnson. At the urging of Scarborough, Booker, Davis, and Scarborough met Johnson at a park where they began beating and kicking him. After the beating, the trio placed Johnson in the back of his Jeep and transported him to Vancleave. There the trio, now joined by Shields, continued the beating and took Johnson's Jeep and wallet. After being reported missing by his family, Johnson was found in Vancleave on January 6, 2003. Johnson's principal cause of death was determined to be severe blunt injuries to the head, although contributing causes included several severe cuts to his face and neck, broken ribs, and fluid buildup in his lungs.

*Booker*, 5 So. 3d at 416 (¶3) (misspellings corrected). We discuss additional facts as necessary in our analysis below.

¶6. Booker, Shields, Davis, and Scarborough were arrested and indicted for capital murder. Shields, who was eighteen years old at the time of the murder, pled guilty to manslaughter and robbery and was sentenced to consecutive terms of twenty and fifteen years in the custody of the Department of Corrections. *Shields v. State*, 75 So. 3d 86, 87 (¶1) (Miss. Ct. App. 2011) (affirming the denial of PCR). Davis, who was sixteen years old at

the time of the murder, pled guilty to deliberate-design murder and was sentenced to life imprisonment without eligibility for parole. *Davis v. State*, 234 So. 3d 440, 441 (¶4) (Miss. Ct. App. 2017) (affirming the denial of PCR under *Miller*), *cert. denied*, 233 So. 3d 821 (Miss. 2018), *cert. denied*, 139 S. Ct. 58 (2018). Scarborough, who was eighteen years old at the time of the murder, was convicted of capital murder following a jury trial and sentenced to life imprisonment without eligibility for parole. *Scarborough v. State*, 956 So. 2d 382, 385 (¶15) (Miss. Ct. App. 2007) (affirming conviction and sentence). Booker, who was sixteen years old at the time of the murder, was convicted of capital murder following a separate jury trial and sentenced to life imprisonment without eligibility for parole. *Booker*, 5 So. 3d at 415 (¶2). As noted above, this Court and the Mississippi Supreme Court affirmed Booker's conviction and sentence, and the United States Supreme Court denied certiorari.

¶7. In 2013, the Mississippi Supreme Court granted Booker leave to file a PCR motion in the circuit court based on the United States Supreme Court's decision in *Miller*.[1] The circuit court subsequently entered an agreed order vacating Booker's sentence and setting the case for a new sentencing hearing pursuant to *Miller*. The court appointed attorney Melvin Cooper to represent Booker and granted Cooper's requests for funds to employ a mitigation specialist (Dr. Tarlanda V. McDaniel-Gooden) and a psychologist (Dr. John Stoudenmire). Cooper filed a motion to impose a sentence of life imprisonment with eligibility for parole

---

[1] In *Miller*, the United States Supreme Court held "that *mandatory* life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Miller*, 567 U.S. at 465 (emphasis added). "*Miller* does not prohibit sentences of life without parole." *Parker v. State*, 119 So. 3d 987, 995 (¶19) (Miss. 2013). But it does require the sentencing authority to take into account "several factors" related to the offender's age before imposing such a sentence. *Id.*

4

or, in the alternative, set the case for a new sentencing hearing before a jury.

¶8. Booker's case was set for a hearing. At the outset of the hearing, Cooper stated, "We're going to waive the motion to impanel a jury." Booker then called his sister, his maternal grandmother, Dr. McDaniel-Gooden, and Dr. Stoudenmire to testify. The State did not call any witnesses. A number of exhibits were admitted into evidence without objection: the testimony and certain exhibits from Booker's 2004 trial; Rule Violation Reports (RVRs) documenting infractions committed by Booker while in the custody of the Department of Corrections; the transcript and video of Booker's post-arrest interview with law enforcement; Scarborough's testimony from her trial; Dr. Stoudenmire's psychological evaluation; Dr. McDaniel-Gooden's mitigation report; and Booker's school records.

¶9. Following the hearing, the circuit judge entered a seven-page order denying relief under *Miller*. The judge's order discussed the evidence presented and made findings of fact related to Booker's childhood and home life, the circumstances of the murder, and the *Miller* factors. The judge stated that after considering the evidence and "each of the *Miller* factors relevant to a consideration of parole," he found that "Booker [did] not qualify to be re-sentenced in such a manner as to make him eligible for parole consideration."

¶10. Booker filed a "Motion for a New Trial or Related Relief," in which he asked the circuit judge to resentence him to life imprisonment with eligibility for parole, order a new sentencing hearing before a jury, or reopen the hearing to allow him to present additional evidence. The judge denied the motion, and Booker filed a notice of appeal. On appeal, Booker raises the issues noted above. *See supra* ¶4.

5

## ANALYSIS

¶11. This Court, the Mississippi Supreme Court, and/or the United States Supreme Court have previously considered and rejected several of the arguments that Booker makes on appeal. These include Booker's claims that he has a constitutional right to be resentenced by a jury;[2] that the circuit judge was required to make a specific finding of fact that he is "permanently incorrigible";[3] and that a sentence of life without parole is "categorically" unconstitutional in all cases in which the defendant committed a murder while being a minor.[4] These issues have been addressed thoroughly in prior cases and require no new discussion here. Therefore, we focus on Booker's remaining claims that (1) he has a statutory right to be resentenced by a jury; (2) "the circuit court applied the wrong legal standard and failed to properly assess the *Miller* factors"; (3) "he was deprived of an opportunity to be heard on the central issue of his capacity for rehabilitation"; (4) the attorney who represented him in the circuit court provided ineffective assistance; and (5) a sentence of life without parole is unconstitutional in his case because he was a minor when he committed the murder and is also "intellectually disabled."

---

[2] *See, e.g.*, *McGilberry*, 292 So. 3d at 206-07 (¶¶30-32) (holding that there is no constitutional right to a jury in a *Miller* hearing); *Cook v. State*, 242 So. 3d 865, 876 (¶¶38-40) (Miss. Ct. App. 2017) (same), *cert. denied*, 237 So. 3d 1269 (Miss. 2018), *cert. denied*, 139 S. Ct. 787 (2019); *accord Jones v. Mississippi*, 141 S. Ct. 1307, 1316 n.3 (2021).

[3] *See, e.g.*, *Jones*, 141 S. Ct. at 1311 (rejecting the "argument that the sentencer must make a finding of permanent incorrigibility" before imposing a sentence of life without parole in the case of a defendant who was a minor at the time of his offense); *Jones v. State*, 285 So. 3d 626, 632 (¶17) (Miss. Ct. App. 2017), *aff'd*, 141 S. Ct. 1307 (2021).

[4] *See, e.g.*, *Wharton*, 298 So. 3d at 926 (¶22).

6

## I.       Booker does not have a statutory right to be resentenced by a jury.

¶12.    Booker argues that he should have been resentenced by a jury pursuant to Mississippi Code Annotated section 99-19-101(1) (Rev. 2020) because he was convicted of capital murder.  As we explain below, this argument has been rejected by both the Mississippi Supreme Court and this Court.

¶13.    Section 99-19-101(1) provides in relevant part:

> Upon conviction or adjudication of guilt of a defendant of capital murder . . . , the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment.  The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable.  If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty.  If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing.[5]

¶14.    In *Moore v. State*, 287 So. 3d 905 (Miss. 2019), the Mississippi Supreme Court held that this statute governs the sentencing of "a minor convicted of capital murder post-*Miller*." *Id.* at 919 (¶57).  Thus, a minor "convicted of capital murder post-*Miller*" has a statutory right to have a jury determine whether he should be sentenced to life imprisonment with or without eligibility for parole. *Id.* at (¶59).  However, the Court also made clear that its holding was "limited to the facts of [that] case: a minor convicted of capital murder

---

[5] As noted above, at the outset of the hearing in the circuit court, Booker's attorney stated that Booker waived his request for a jury.  However, Booker did not waive a jury "in writing," and on appeal the State does not rely on counsel's oral waiver.  Rather, the State only argues that section 99-19-101(1) does not apply in this case.  Therefore, we also address that issue on the merits.

post-*Miller* who was denied sentencing by a jury." *Id.* at (¶57). In *Moore*, the Court specifically did not address "scenarios in which defendants [seek] *resentencing* by a jury post-*Miller*." *Id.*

¶15. In *Wharton*, the Mississippi Supreme Court addressed the question whether resentencing by a jury is required in the context of a PCR motion filed by a prisoner whose conviction and sentence were already final when *Miller* was decided. *Wharton*, 298 So. 3d at 923 (¶¶1-4). Wharton was convicted in 1995 for a murder he committed when he was seventeen years old. *Id.* at (¶5). After the jury found him guilty of capital murder, "the jury was instructed to decide whether Wharton should be sentenced to 'death, life imprisonment without parole, or life imprisonment.'" *Id.* at (¶6). At the time of Wharton's trial, the death penalty was an option because the United States Supreme Court had not yet prohibited the "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (overruling *Stanford v. Kentucky*, 492 U. S. 361 (1989)). The jury found that Wharton should be sentenced to life imprisonment without eligibility for parole. *Wharton*, 298 So. 3d at 924 (¶6).

¶16. Post-*Miller*, the Supreme Court granted Wharton leave to file a PCR motion in the trial court. *Id.* at 924 (¶8). Thereafter, the trial court vacated Wharton's sentence and granted him a new sentencing hearing under *Miller*. *Id.* at 923 (¶1). However, the trial court rejected Wharton's argument that he had a statutory right to have a jury determine his sentence. *Id.* at 924 (¶¶9-10).

¶17. On appeal, this Court concluded that under section 99-19-101, "Wharton's *Miller*

8

resentencing determination should be undertaken by a jury." *Wharton v. State*, No. 2017-CA-00441-COA, 2018 WL 4708220, at *4 (¶15) (Miss. Ct. App. Oct. 2, 2018), *rev'd*, 298 So. 3d 921 (Miss. 2019). Therefore, we reversed and remanded the case for a new sentencing hearing before a jury. *Id.* at *1 (¶3).

¶18. The Mississippi Supreme Court granted certiorari and reversed this Court's decision, holding that section 99-19-101 did not entitle Wharton to a jury at his post-conviction *Miller* hearing. *Wharton*, 298 So. 3d at 925 (¶20). The Court reasoned that the United States Supreme Court's decisions in *Miller* and *Montgomery v. Louisiana*, 577 U.S. 190 (2016), only held that "prisoners like [Wharton] must be given *the opportunity to show* their crime did not reflect irreparable corruption" and, hence, that they should be eligible for parole. *Wharton*, 298 So. 3d at 927 (¶25) (quoting *Montgomery*, 577 U.S. at 213). The Mississippi Supreme Court held that "Mississippi's PCR statute provides this opportunity to prisoners, such as Wharton, whose convictions and sentences were final when *Miller* was decided." *Id.* at (¶26). In other words, such prisoners are not entitled to a new sentencing hearing before a jury but rather are "entitled . . . to an evidentiary hearing in the trial court, at which that court [will] consider and apply the *Miller* factors." *Id.* at 928 (¶32). The Court also clarified that in such a case, the trial court should not vacate the prisoner's sentence and hold a new sentencing hearing; rather, the trial court should hold a non-jury *Miller* hearing at which the prisoner bears the burden of persuading the court that he is entitled to relief under *Miller*. *Id.* at 926-28 (¶¶22, 25-29).

¶19. The Mississippi Supreme Court reached the same result in *McGilberry*, 292 So. 3d

at 207-08 (¶¶33-37).[6]  In 1994, then-sixteen-year-old McGilberry brutally murdered four of his family members.  *Id.* at 200 (¶1).  Following a jury trial, he was convicted of four counts of capital murder and sentenced to death.  *Id.*  After the United States Supreme Court's decision in *Roper*, McGilberry's death sentence was vacated, and he was resentenced to life without parole.  *Id.*  Post-*Miller*, the Mississippi Supreme Court granted McGilberry leave to file a PCR motion in the trial court, and the trial court vacated McGilberry's sentence for a new sentencing hearing pursuant to *Miller*.  *Id.* at 202 (¶13).  However, the trial court rejected McGilberry's argument that he was entitled to be resentenced by a jury.  *Id.* at (¶14).

¶20.    On appeal, the Mississippi Supreme Court "first point[ed] out that McGilberry should have never been *re*-sentenced by the trial court."  *Id.* at 206 (¶29).  The Supreme Court stated that "the trial court should not have vacated McGilberry's sentence *before* considering his PCR motion . . . .  What should have occurred was the simple denial of McGilberry's PCR motion, not resentencing him to life without parole based on the denial of [his] PCR motion."  *Id.*  In addition, the Court held that McGilberry did not have a statutory right to a jury at his post-conviction *Miller* hearing.  The Court explained that

> the Court of Appeals [held that] McGilberry had a statutory right to have a jury resentence him.  The appellate court broadly interpreted Mississippi Code Section 99-19-101, which governs sentencing following a capital-murder conviction, to include the right to be resentenced by a jury following the retroactive application of *Miller*.  But, with respect to the Court of Appeals, Section 99-19-101 does not address the scenario before us—the resentencing

---

[6] Based on this Court's prior decision in *Wharton* (*see supra* ¶17), this Court had held that McGilberry had a statutory right to have a jury determine whether he was entitled to parole eligibility under *Miller*.  *McGilberry v. State*, No. 2017-KA-00716-COA, 2019 WL 192345, at *4 (¶14) (Miss. Ct. App. Jan. 15, 2019), *rev'd*, 292 So. 3d 199 (Miss. 2020).  Just as in *Wharton*, the Mississippi Supreme Court granted certiorari and reversed our decision.

of a juvenile offender based on the constitutional requirements of *Miller*.

*Id.* at 207 (¶33) (emphasis, quotation marks, and citation omitted). Accordingly, the Supreme Court held that the trial court did not err by denying McGilberry's motion to be resentenced by a jury. *Id.* at 208 (¶37).

¶21. Finally, in *Martin v. State*, 329 So. 3d 451 (Miss. Ct. App. 2020), *cert. denied*, 329 So. 3d 1201 (Miss. 2021), this Court discussed and followed the Supreme Court's decisions in *Moore*, *Wharton*, and *McGilberry*. In 2002, following a jury trial, Martin was convicted of capital murder for a crime he committed when he was seventeen years old. *Martin*, 329 So. 3d at 453-54 (¶¶1, 3). After the State announced that it would not seek the death penalty, the trial court—acting without a jury—sentenced Martin to life without parole. *Id.* at 454 (¶3). As we explained in *Martin*, the trial judge did not err by dispensing with a jury at sentencing because the Legislature had amended the parole-eligibility statute to prohibit parole following a conviction for capital murder. *Id.* at 458-59 (¶17). Therefore, once the State declined to seek the death penalty, life without parole was the only possible sentence under the law at that time. *Id.* at 457-58 (¶14) (discussing *Pham v. State*, 716 So. 2d 1100, 1103-04 (¶¶21-24) (Miss. 1998)).

¶22. Post-*Miller*—as in *Wharton* and *McGilberry*—the Mississippi Supreme Court granted Martin permission to file a PCR motion in the trial court, and the trial court thereafter entered an agreed order vacating Martin's sentence for a new sentencing hearing pursuant to *Miller*. *Id.* at 454 (¶4). However, the trial court rejected Martin's argument that he was entitled to be resentenced by a jury. On appeal, after thoroughly discussing *Moore*, *Wharton*, and

*McGilberry*, this Court unanimously held that the trial court properly denied Martin's request for a jury. *Id.* at 455-58 (¶¶8-15).

¶23. When we addressed this issue in *Martin*, we noted that "Martin [sought] to distinguish his case from *Wharton* on the ground that he [(i.e., Martin)] ha[d] never had a jury sentencing hearing, whereas Wharton was originally sentenced by a jury." *Id.* at 457 (¶14). But we held that this distinction had no "legal significance." *Id.* We explained that Wharton was sentenced by a jury only because the State sought the death penalty in his case. *Id.*[7] In contrast, Martin was not sentenced by a jury only because the State did not seek the death penalty, which left life without parole as the only possible sentence. *Id.* at 457-58 (¶14). We held that under *Wharton* and *McGilberry*, there was no right to a jury in a post-conviction *Miller* hearing regardless of whether there was a jury at the prisoner's original sentencing hearing. *Id.* at (¶¶14-15). As the Supreme Court explained in *McGilberry*, section 99-19-101 grants a defendant convicted of capital murder a right to a jury at his original sentencing hearing. *McGilberry*, 292 So. 3d at 201 (¶4). "But this statute is silent about and thus extends no rights to the scenario we face here—post-conviction review of [a] life-without-parole sentence following [*Miller*'s] new substantive rule of constitutional law." *Id.* Following our decision, Martin filed a petition for a writ of certiorari in the Mississippi Supreme Court, which the Court denied by an eight-to-one vote.

¶24. In this case, Booker makes the exact same argument as the defendant in *Martin*—i.e., that his case is different from *Wharton* and *McGilberry* because he (i.e., Booker) "was never

---

[7] The same could be said of *McGilberry*. Our opinion in *Martin* focused on *Wharton* only because Martin's argument focused on *Wharton*.

sentenced by a jury." But as we held in *Martin*, this distinction has no "legal significance." *Martin*, 329 So. 3d at 457 (¶14). Under *Wharton*, *McGilberry*, and *Martin*, Booker was not entitled to a jury at his post-conviction *Miller* hearing.[8]

¶25. In holding that Booker was not entitled to a jury, we have not, as the dissent claims, "ignore[d] the statute" (i.e., section 99-19-101). *Post* at ¶53. Rather, we have simply followed the Supreme Court's holding in *McGilberry* and this Court's unanimous holding in *Martin* that the statute *does not apply* in the context of a PCR motion filed by a prisoner whose conviction and sentence were already final when *Miller* was decided. *McGilberry*, 292 So. 3d at 201, 207 (¶¶4, 33); *Martin*, 329 So. 3d at 458 (¶15). Such a prisoner is entitled to a PCR hearing before a judge, not a sentencing hearing before a jury. *McGilberry*, 292 So. 3d at 207 (¶33); *Wharton*, 298 So. 3d at 927 (¶26); *Martin*, 329 So. 3d at 458 (¶15); *see also Wharton*, 298 So. 3d at 932 (¶50) (Kitchens, P.J., dissenting) ("Now the remedy in cases on collateral review is not a new sentencing hearing, but an evidentiary hearing under the

_____

[8] Booker also asserts that he was entitled to a jury because the circuit court entered an agreed order vacating his sentence for a new sentencing hearing. Booker argues that once the circuit court vacated his sentence, he was no longer a "PCR petitioner" but simply a criminal defendant entitled to a sentencing hearing. However, similar orders vacating the prisoners' sentences were also entered in *Wharton*, *McGilberry*, and *Martin*. *Wharton*, 298 So. 3d at 926 (¶22); *McGilberry*, 292 So. 3d at 206 (¶29); *Martin*, 329 So. 3d at 454 (¶4). In both *Wharton* and *McGilberry*, the Supreme Court held that the circuit court erred by vacating the prisoner's sentence prior to holding a PCR hearing. *Wharton*, 298 So. 3d at 926-28 (¶¶22, 29); *McGilberry*, 292 So. 3d at 206 (¶29). In each case, the Court essentially disregarded the error and analyzed the hearing in the circuit court as a PCR hearing—not a new, de novo sentencing hearing. *Wharton*, 298 So. 3d at 926-28 (¶¶22-29); *McGilberry*, 292 So. 3d at 206 (¶29). We are, of course, obliged to follow these precedents in this case. Indeed, Booker's argument—that the circuit court's order vacating his original sentence is controlling and cannot be undone or disregarded—is actually borrowed from one of the dissents in *Wharton*. *Wharton*, 298 So. 3d at 937 (¶65) (Coleman, J., dissenting).

Uniform Post-Conviction Collateral Relief Act. . . .").  Accordingly, the circuit judge did not

err by proceeding without a jury.

> II.    **The circuit judge applied the correct legal standard and did not abuse his discretion by denying Booker's request for parole eligibility.**

¶26.    As the Mississippi Supreme Court explained in *Parker v. State*, 119 So. 3d 987 (Miss.

2013), "*Miller* does not prohibit sentences of life without parole for juvenile offenders.

Rather, it 'requires the sentencing authority to take into account how children are different,

and how those differences counsel against irrevocably sentencing them to a lifetime in

prison.'" *Id.* at 995 (¶19) (brackets omitted) (quoting *Miller*, 567 U.S. at 480).  "The *Miller*

Court identified several factors that must be considered by the sentencing authority . . . ."

*Id.*  These include:

- the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences";

- the defendant's "family and home environment";

- "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him";

- whether the defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and

- whether the circumstances suggest that there is a "possibility of rehabilitation."

*Id.* at 995-96 (¶19) (quoting *Miller*, 567 U.S. at 477-78).  The burden is on the defendant to

convince the sentencing authority—in this case, the circuit judge—that the relevant *Miller* factors prohibit a sentence of life without parole. *Wharton*, 298 So. 3d at 927 (¶25); *Cook*, 242 So. 3d at 873 (¶25). If the circuit judge considers these factors after affording the defendant a full and fair hearing, then we review the judge's ultimate sentencing decision only for an abuse of discretion. *Chandler v. State*, 242 So. 3d 65, 68 (¶¶7-8) (Miss. 2018); *Cook*, 242 So. 3d at 872-74 (¶¶23-24, 27).

¶27. In the present case, the circuit judge appointed counsel for Booker, granted Booker funds for expert assistance, afforded Booker a full and fair evidentiary hearing, made findings of fact that are supported by substantial evidence, and considered and applied the *Miller* factors. The judge noted that Booker was sixteen years, two months, and sixteen days old and a sophomore in high school when he committed the murder. The victim, Johnson, was "a 52-year-old Navy veteran and former instructor at Keesler Air Force Base in Biloxi" who was "disabled from a stroke two years earlier that left his right side paralyzed and shriveled." Prior to the murder, Johnson "had been engaged in a decidedly improper, perhaps sexual, relationship" with Booker's ex-girlfriend Scarborough. During her trial, Scarborough testified that Johnson gave her marijuana and money, paid her bills, and even bought her cars. Scarborough, who was eighteen years old at the time of the murder, testified that she allowed Johnson to perform oral sex on her but rebuffed his attempts to engage in sexual intercourse.

¶28. The circuit judge found that about two weeks prior to the murder, Booker, Scarborough, and Davis began planning to "scar[e] Johnson away from Scarborough." Their plan "evolved . . . to . . . beating and robbing [Johnson] and, ultimately, to robbing and

15

murdering him." On the evening of the murder, "the three lured Johnson to a secluded park in Moss Point." "Davis ha[d] Johnson drive him to the park, ostensibly to meet Scarborough and smoke marijuana." Scarborough and Booker then arrived at the park in Scarborough's car, with Booker "hidden in the back seat so as not to alarm Johnson."[9] Scarborough went to Johnson's Jeep and began talking to Davis and Johnson. Davis then began assaulting Johnson, and Booker came to Johnson's Jeep and joined in the assault. Booker and Davis beat and kicked Johnson until he was unconscious but still alive. Booker, Scarborough, and Davis then decided to drive to a nearby alligator farm to dispose of Johnson's body. Booker drove Johnson's Jeep with Davis in the passenger seat and Johnson in the backseat on the floorboard. Scarborough followed in her car. On the way to the alligator farm, Davis beat Johnson again because Johnson reached up from the backseat of the Jeep and grabbed a chain that Davis was wearing.

¶29. The gate to the alligator farm was locked, so Booker, Davis, and Scarborough "decided to travel into rural parts of Jackson County to dispose of Johnson." Booker called his cousin, Shields, and asked him to help, and Shields agreed. After picking up Shields, the group drove to a logging road in a secluded area near Vancleave. Johnson was still alive at this point, and Booker and Davis dragged him from the Jeep and resumed beating and stomping him. In addition, Davis used a knife to slash Johnson's head and neck. Johnson suffered numerous injuries, including broken ribs and massive trauma to his head and chest. Booker and Davis searched Johnson and his clothes for money but found nothing but an

---

[9] Booker's presence would have alarmed Johnson because a few weeks prior to the murder, Booker punched Johnson in the head, resulting in injuries that required stitches.

16

ATM card, which proved useless without Johnson's PIN. They then dragged Johnson under a fence on the side of the logging road, where they left him to die. According to the forensic pathologist who testified at trial, Johnson likely died several hours later. The group then drove to Scarborough's house, where they "attempt[ed] to conceal and destroy evidence of their crime" by wiping down the Jeep for fingerprints and burning Booker and Davis's blood-stained clothes. They disposed of the knife and other evidence and then decided to abandon Johnson's Jeep at the airport in Gulfport.

¶30. Addressing the *Miller* factors, the circuit judge found that although the murder may have been "amateurish," the extended planning by Booker and his accomplices "belie[d] any impetuosity of youth." *See Parker*, 119 So. 3d at 995 (¶19) (quoting *Miller*, 567 U.S. at 477). The judge also found that the group's efforts to "conceal and destroy evidence of their crime . . . all demonstrate[d] an acute appreciation of the risks and consequences of their actions." *See id.* In addition, the judge found there was "little evidence that Booker was subjected to peer pressure." *See id.* at 996 (¶19) (quoting *Miller*, 567 U.S. at 477). Rather, the evidence showed that Booker helped to plan the crime, was then an enthusiastic participant in beating Johnson to death, and even enlisted his own cousin to help in the murder.

¶31. Regarding Booker's family and home life, the evidence showed that Booker's mother had a drinking or drug problem when he was young and that he and his three siblings went to live with his maternal grandparents in Gautier. Booker's older sister, Victoria Plummer, said that their grandmother, Jerilan Covington, was abusive, having disciplined them by whipping them with a brown extension cord. Covington acknowledged that she spanked

17

Booker (i.e., "gave him whoppings [sic]"), but she denied that she "ever beat him with anything." Plummer also testified that their grandfather worked hard to provide for them and that their grandparents generally "did the best they could" for her and her brothers. Their grandparents sent Booker to a private Catholic elementary school in Biloxi. Plummer also testified that both she and Booker had "a great relationship with [their] father," who worked at Ingalls Shipyard and helped raise them.

¶32. Plummer testified that when Booker was twelve years old, Covington divorced their grandfather, and Covington's new boyfriend moved in with them. Plummer said that their grandfather had been a moderating influence on Covington, and Covington began to beat or whip her and her siblings more often after the divorce. As a result, Plummer, Booker, and their two brothers went to live with their mother in Maryland. About a year later, they all moved back to the Mississippi Gulf Coast. Plummer testified that her mother tried to make up for "lost time" by being a "friend" to Booker rather than a "disciplinarian." There was evidence that Booker and his friends smoked marijuana with his mother.

¶33. In elementary school, Booker was diagnosed with a speech impediment and a learning disability, primarily related to reading. As a result, Booker's grandparents transferred him to the public school system, which had greater resources to address his needs. An IQ assessment administered by the school system determined that Booker had an IQ of 98, which was in the average or low-average range.

¶34. Prior to Booker's capital murder trial in 2004, Booker's attorney hired Dr. John Stoudenmire, a psychologist, to evaluate him. Based on a one-time evaluation in 2004, Dr.

18

Stoudenmire determined that Booker had an IQ of only 65, which indicated a mild mental disability. However, Dr. Stoudenmire conceded it was possible that Booker was simply malingering in order to avoid the death penalty.[10]

¶35. In his written opinion denying relief under *Miller*, the circuit judge considered the issues regarding Booker's home and family life. *See Parker*, 119 So. 3d at 995-96 (¶19) (citing *Miller*, 567 U.S. at 477). The judge acknowledged that Booker came from a "broken home," used marijuana, and struggled with a learning disability. However, the judge found that Booker was not using any drugs on the night of the murder and that nothing in Booker's childhood could "explain or exculpate Booker's role" in the murder.

¶36. Finally, the circuit judge found that there was "very little, if any, evidence suggesting a possibility of rehabilitation." *See Parker*, 119 So. 3d at 996 (¶19) (quoting *Miller*, 567 U.S. at 478). Booker did not testify at the hearing, and the judge noted that Booker's prison record showed a series of rules violations for fighting, possessing and using drugs, refusing to obey orders, and possessing shanks, gang-related material, and other contraband.

¶37. The circuit judge's factual findings are all supported by substantial evidence. In addition, the circuit judge considered and applied the relevant *Miller* factors in a non-arbitrary fashion. Given the circumstances of Booker's offense and the other relevant evidence in the record, we cannot say that the circuit judge abused his discretion by denying relief under *Miller*. *Cook*, 242 So. 3d at 873-74 (¶27).

### III. Booker was not deprived of an opportunity to be heard on the issue

---

[10] *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (holding that the death penalty may not be imposed on a "mentally retarded criminal").

**of rehabilitation.**

¶38.   Booker asserts that the circuit judge denied him "notice and an opportunity to be heard with respect to the crucial issue of [his] capacity for rehabilitation." This simply is not true. As set out above, the circuit judge appointed counsel to represent Booker, authorized funds for a mitigation expert and psychologist, and afforded Booker a full and fair evidentiary hearing. Moreover, Booker certainly had "notice" that his capacity for rehabilitation was at issue. *Parker* makes clear that "the possibility of rehabilitation" is one of "several factors that must be considered" under *Miller*. *Parker*, 119 So. 3d at 995-96 (¶19). Booker's counsel addressed this issue both in his pre-hearing motion and at the hearing. Clearly, Booker had notice and an opportunity to be heard.

¶39.   Booker's more specific complaint is that the circuit judge's written opinion noted that there was "no information suggesting [Booker's] participation in any of the myriad programs or courses available through the Department of Corrections," and in a footnote the judge cited to a website listing various programs available to prisoners in the custody of the Department. In Booker's motion for a new trial, he asserted that the court erred by going outside the record and relying on the Department's website, and he requested an opportunity to reopen the record "to present rebuttal testimony about the . . . [p]rograms available to inmates sentenced to life and the particular programs he participated in." The circuit judge denied Booker's motion. On appeal, Booker again argues that the circuit judge erred by relying on the website.

¶40.   We agree with Booker that a judge generally should not make findings based on

20

"information outside of the record that neither party presented." *Pruitt v. Pruitt*, 144 So. 3d 1249, 1253 (¶11) (Miss. Ct. App. 2014).[11]  However, "[w]e will not reverse . . . based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014).  Here, the circuit judge's more general point that Booker had presented no evidence of his capacity for rehabilitation was not dependent on his citation to the website.  Moreover, there is nothing to indicate that the judge's footnoted citation to the Department's website played any role in his ultimate decision that Booker was not entitled to relief under *Miller*.  Accordingly, the error was harmless and not grounds for reversal.

## IV.  Booker fails to show that his attorney provided ineffective assistance.

¶41.    Booker argues that the attorney who represented him in his *Miller* hearing provided ineffective assistance by failing to obtain a ruling on a motion requesting additional funds for Booker's mitigation expert to conduct additional witness interviews.  Booker also argues that his attorney provided ineffective assistance by not hiring a psychologist to testify to Booker's "capacity for rehabilitation" or his "growth and development" as a person.  As noted above, the circuit judge granted Booker's request for funds to retain Dr. Stoudenmire, the psychologist who had evaluated Booker prior to his capital murder trial in 2004.  At the *Miller* hearing in the circuit court, Dr. Stoudenmire testified about his 2004 evaluation of Booker and his assessment of Booker's IQ, but he did not testify specifically regarding

---

[11] It is true that the Mississippi Rules of Evidence do not apply in "sentencing" "proceedings." MRE 1101(b)(4). However, as noted above, the Mississippi Supreme Court has held that in cases that were already final when *Miller* was decided, a "*Miller* hearing" should be conducted as a PCR hearing, not a new sentencing hearing. *McGilberry*, 292 So. 3d at 206 (¶29) & n.7; *Wharton*, 298 So. 3d at 926-28 (¶¶22, 26, 29).

21

Booker's capacity for rehabilitation.

¶42. "A claim of ineffective assistance of counsel requires proof that counsel's performance was objectively deficient *and* that the defendant suffered prejudice as a result." *Worth v. State*, 223 So. 3d 844, 849 (¶17) (Miss. Ct. App. 2017) (emphasis added) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).[12] Under *Strickland*'s first prong, the defendant must overcome a "strong but rebuttable presumption[ ] that counsel's performance falls within the wide range of reasonable professional assistance." *Rankin v. State*, 636 So. 2d 652, 656 (Miss. 1994). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Under *Strickland*'s second prong, a defendant must show "prejudice," i.e., "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The defendant has the burden of proof on both prongs." *Rankin*, 636 So. 2d at 656. "If either prong of *Strickland* is not met, the claim fails." *Worth*, 223 So. 3d at 849 (¶17).

¶43. Here, there is nothing to suggest that either of counsel's alleged errors (even assuming that they were errors) had any effect on the proceeding. That is, there is nothing to suggest

---

[12] In general, "[a] defendant has no state or federal right to counsel in post-conviction proceedings," and "[w]here there is no constitutional right to counsel, there can be no deprivation of effective assistance." *Sheffield v. State*, 881 So. 2d 249, 255 (¶24) (Miss. Ct. App. 2003). As noted above, the Mississippi Supreme Court has now held that in cases that were already final when *Miller* was decided, the defendant's "*Miller* hearing" should be treated as an evidentiary hearing under the Uniform Post-Conviction Collateral Relief Act, not a new sentencing hearing. *McGilberry*, 292 So. 3d at 206 (¶29) & n.7; *Wharton*, 298 So. 3d at 926-28 (¶¶22, 26, 29). However, we assume for purposes of this appeal that Booker had a right to the effective assistance of counsel for his *Miller* hearing.

22

that any additional interviews would have yielded evidence that would have been relevant or persuasive under *Miller*. Nor is there anything to suggest that Dr. Stoudenmire or some other psychologist could or would have testified persuasively regarding Booker's alleged "capacity for rehabilitation" or "growth and development." Accordingly, Booker fails to meet his burden under *Strickland*, and this claim is without merit.

### V. Booker's sentence is not unconstitutional.

¶44. Booker finally argues that his sentence is unconstitutional based on a combination of his age at the time of the offense and Dr. Stoudenmire's 2004 assessment that he has an IQ of 65, which allegedly "demonstrated mild mental retardation." For this argument, Booker relies on *Miller* and *Atkins*, which held that "mentally retarded offenders" are ineligible for the death penalty because they are "less morally culpable." *Atkins*, 536 U.S. at 319-20.

¶45. This argument is without merit. To begin with, the evidence regarding Booker's IQ is conflicting. As noted above, the school system administered an IQ test several years prior to the murder and determined that Booker had an average or slightly low-average IQ of 98. Regardless, neither an intellectual disability nor the defendant's age at the time of the offense is sufficient to render a defendant categorically ineligible for a sentence of life without parole.

### CONCLUSION

¶46. Booker did not have a constitutional or statutory right to a jury at his post-conviction *Miller* hearing, and the circuit judge did not abuse his discretion or otherwise err by denying relief under *Miller*. Therefore, the judgment of the circuit court is **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE AND McCARTY, JJ., CONCUR. McDONALD, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J. LAWRENCE, SMITH AND EMFINGER, JJ., NOT PARTICIPATING.**

**McDONALD, J., DISSENTING:**

¶47. I respectfully dissent from the majority opinion that grants the State's motion for rehearing and affirms the circuit court's judgment because Booker's facts are distinguishable from *Wharton v. State*, 298 So. 3d 921 (Miss. 2019), and *McGilberry v. State*, 292 So. 3d 199 (Miss. 2020). Booker was *never* sentenced by a jury, which is his statutory right under Mississippi Code Annotated section 99-19-101 (Rev. 2020). Even *Wharton* and *McGilberry* recognized the continuing statutory obligation that a juvenile defendant convicted of a capital offense must be sentenced at least once by a jury. Booker's case is controlled by a more factually similar supreme court case, *Moore v. State*, 287 So. 3d 905 (Miss. 2019), and I continue to hold that Booker is entitled to sentencing by a jury at least once. Moreover, although we dealt with a similarly situated defendant in *Martin v. State*, 329 So. 3d 451 (Miss. Ct. App. 2020), after further analysis, I realize our reasoning was in error, and that case should not control. Accordingly, I would deny the State's motion for rehearing in this case, and maintain our prior disposition to reverse Booker's sentence and remand for further proceedings.

¶48. To understand my position, I review the genesis of the two Mississippi Supreme Court cases. In our decision in *Wharton v. State* (*Wharton I*), No. 2017-CA-00441-COA, 2018 WL 4708220 (Miss. Ct. App. Oct. 2, 2018), *rev'd*, 298 So. 3d 921 (Miss. 2019), we held that then seventeen-year-old Wharton, who was convicted of capital murder and sentenced by a jury

24

to life without parole prior to *Miller v. Alabama*, 567 U.S. 460 (2012), was entitled to be resentenced by a jury. *Id*. at *4 (¶15). We noted that the Mississippi Legislature had not specifically identified what sentencing authority should consider the *Miller* factors on resentencing. *Id*. at *6 (¶20). For that reason, we looked to the underlying sentencing statute to determine the prescribed sentencing authority and found that the Legislature had vested sentencing authority in the jury by the express language of the statute:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. *The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. . . .*

*Id*. (citing Miss. Code Ann. § 99-19-101(1) (emphasis added)). We further said that resentencing should only be conducted by a trial judge if the right to a jury has been waived or if the defendant had previously pleaded guilty. *Id*. at *4 (¶15).

¶49. We reiterated the *Wharton I* parameters for jury resentencing in another post-*Miller* resentencing case, *McGilberry v. State* (*McGilberry I*), No. 2017-KA-00716-COA, 2019 WL 192345 (Miss. Ct. App. Jan. 15, 2019), *rev'd*, 292 So. 3d 199 (Miss. 2020). The procedural posture of that case was slightly different than that in *Wharton* because the jury had sentenced McGilberry to death. *Id*. at *1 (¶1). Following *Roper v. Simmons*, 543 U.S. 551 (2005), which abolished the death penalty for juveniles, McGilberry's sentence was reduced to life in prison without parole. *McGilberry*, 2019 WL 192345, at *4 (¶2). After *Miller*, the Mississippi Supreme Court granted McGilberry leave to file a motion for post-conviction relief for resentencing. *Id*. at *1 (¶3). At resentencing, the circuit court denied McGilberry's

25

request for resentencing by a jury, *id*. at (¶4), proceeded with the *Miller* hearing, and resentenced McGilberry to life without parole. *Id*. at \*2 (¶7). On appeal, we reversed based on our ruling in *Wharton I*, and we remanded for resentencing by a jury. *Id*. at \*4 (¶14). We also distinguished *McGilberry I* from *Pham v. State*, 716 So. 2d 1100 (Miss. 1998)[13] because *Pham* did not involve the sentencing of a juvenile. *Id*. at (¶12). We distinguished *Pham*, saying that unlike the adult defendant Pham, McGilberry was a juvenile and entitled under *Miller* to a sentencing hearing before a jury to determine if he may be eligible for life with parole. We said:

> Here, the *Miller* sentencing hearing allows the sentencing authority to decide whether to sentence McGilberry to life with or without eligibility for parole. Thus, we cannot say that remanding for the appropriate sentencing authority—the jury—would be a "meaningless, procedural step" elevating "form over function." *See Pham*, 716 So. 2d at 1104 (¶24).

*Id*. at \*4 (¶12). Pursuant to our holding in *Wharton I*, we held that McGilberry's sentencing decision should be made by a jury unless waived in writing. *Id*. at (¶14).

¶50. The Mississippi Supreme Court also underscored this statutory requirement of a jury sentencing in *Moore v. State*, 287 So. 3d 905 (Miss. 2019), a post-*Miller* case where Moore, a juvenile, was convicted of capital murder. *Id*. at 917 (¶46). He moved for jury sentencing, which the circuit court denied. *Id*. at 911 (¶15). The trial court heard testimony on the *Miller*

---

[13] In *Pham*, the State did not seek the death penalty for the adult defendant who was charged and convicted of capital murder under section 99-19-101. *Id*. at 1103 (¶21). Because Pham was ineligible for parole under the parole statute, the only option left for sentencing was life without parole. *Id*. The Mississippi Supreme Court held that in such a case (i.e., an adult offender charged with capital murder under section 99-91-101), the life-without-parole sentence was automatic, and there was no need to refer the issue of sentencing to the jury; the circuit court could impose the sentence. *Id*.

factors and sentenced him to life without parole. *Id.* On appeal, the supreme court affirmed the conviction but remanded for resentencing by a jury under section 99-19-101. *Id.* at 919 (¶59). The supreme court also distinguished Moore's case from *Pham* as we had done in *McGilberry I*, saying:

> Also, our decision in *Pham v. State* authorizes a common practice among trial courts of sentencing a defendant in a capital case after a jury trial in which the death penalty is not sought despite the contrary language found in Section 99-19-101. *Pham v. State*, 716 So. 2d 1100, 1103-04 (Miss. 1998). This authority, however, is vested in the trial court, because the parole statutes leave only one sentencing option. *Pham*, 716 So. 2d at 1103-04. In the sentencing of a juvenile, capital-murder offender, though, more than one sentence is possible due to *Miller*.

*Id.* at 919 (¶55).

¶51. The Mississippi Supreme Court granted the State's petitions for writ of certiorari in both *Wharton I* and *McGilberry I*. On December 5, 2019, the supreme court issued its opinion in *Wharton v. State* (*Wharton II*), 298 So. 3d 921 (Miss. 2019), and on January 23, 2020, the supreme court issued its opinion in *McGilberry v. State* (*McGilberry II*), 292 So. 3d 199 (Miss. 2020). Both supreme court decisions reversed our holdings in *Wharton I* and *McGilberry I*. Nevertheless, these supreme court decisions do not preclude the relief Booker seeks because the fact that he never had any jury sentence him as required under section 99-19-101 makes his case distinguishable from Wharton's and McGilberry's cases.

¶52. The *Wharton* opinions deal with several distinct issues, among them whether section 99-19-101 requires jury resentencing to consider the *Miller* factors when a juvenile originally had been sentenced by a jury (i.e., whether there was a violation of Wharton's statutory rights), *Wharton II*, 298 So. 3d at 925 (¶20), and whether a life-without-parole

sentence constitutes cruel and unusual punishment under the Eighth Amendment (i.e., whether there was a violation of Wharton's constitutional rights). *Id*. at 926 (¶22). It is important not to confuse the two or cite language from the supreme court's discussion on the constitutional claim when discussing the statutory violation, as the majority does.

¶53. *Wharton II* specifically confirmed the statutory requirement of sentencing by a jury under section 99-19-101 but found there was no statutory violation in Wharton's case because Wharton had been originally sentenced by a jury:

> Here, however, Wharton received a jury sentencing hearing *as required* by Section 99-19-101(1). Thus, unlike in *Moore*, there was no statutory violation in this instance. And while we find that Wharton is entitled to a *Miller* hearing, we do not find that he is entitled to a *Miller* hearing in front of a *new* jury.

*Wharton II*, 298 So. 3d at 925 (¶20) (emphasis added). The supreme court did not ignore the statute, as the majority does here, but rather noted that the requirement for jury sentencing had been met.[14] Finding that there was no statutory violation because Wharton was originally sentenced by a jury, the supreme court held he was not entitled to another jury on resentencing. *Id*. In *McGilberry II*, the supreme court again affirmed that a defendant convicted under section 99-19-101 had a statutory right to be sentenced by a jury. *McGilberry II*, 292 So. 3d at 207 (¶34). Although the supreme court said that its decision in *Moore* was limited to its facts and the sentencing of a minor who was convicted after *Miller*,

---

[14] When the majority states in paragraph 18 of its opinion above that the supreme court in *Wharton II* held that "section 99-19-101 did not entitle Wharton to a jury at his post-conviction *Miller* hearing," it fails to limit that statement to Wharton's facts—namely to a defendant who was originally afforded sentencing by a jury. The majority's statement implies that *Wharton II* found that statute does not apply to *Miller* hearings at all, when, in fact, *Wharton II* said the opposite.

28

the supreme court said that McGilberry still had that same statutory right:

> To be sure, as a capital offender, McGilberry had a statutory right to be sentenced by a jury. *See Moore v. State*, 2017-KA-00379-SCT, 287 So. 3d 905, 919-20 (Miss. May 30, 2019) (clarifying that section 99-19-101 "requires all capital offenders—without exception—to be sentenced by a jury"), *reh'g denied and opinion modified* (Miss. Sept. 12, 2019).

*Id*. But the supreme court said that like Wharton, McGilberry was originally sentenced by the same jury that found him guilty. *McGilberry II*, 292 So. 3d at 207 (¶34). So when the circuit court denied McGilberry's request for jury sentencing, the supreme court held that it did not violate McGilberry's statutory right to jury sentencing under section 99-19-101. *Id*.

¶54. Thus, the supreme court in *Wharton II*, *McGilberry II*, and *Moore* has held that a juvenile who has or had committed a capital offense has a statutory right under section 99-19-101 to be sentenced by a jury. For the majority to imply that these supreme court opinions hold otherwise is wrong.

¶55. The majority also cites as authority our holding in *Martin v. State*, 329 So. 3d 451 (Miss. Ct. App. 2020), *cert. denied*, 329 So. 3d 1201 (Miss. 2021), which dealt with a pre-*Miller* juvenile defendant, like Booker, who had never received a jury sentencing. Although I concurred in *Martin*, upon further reflection, I realize that *Martin* was wrongly decided. In that case, Martin was a juvenile when he committed a capital offense pre-*Miller*. *Id*. at 454 (¶3). He was sentenced to life without parole by a court and not a jury. *Id*. In holding that Martin was not entitled to a jury sentencing to consider the *Miller* factors, we erred in our application of *Wharton II*. As discussed above, we knew that Wharton did receive a jury sentencing, which the supreme court said satisfied the requirements of section 99-19-101.

29

*Wharton II*, 298 So. 3d at 925 (¶20). So to make *Wharton II* apply to Martin's facts, we reasoned that Wharton was only sentenced by a jury because the State sought the death penalty in that case. *Martin*, 329 So. 3d at 457-58 (¶14). We then said that when the State withdrew its request for the death penalty in Martin's case, life without parole was the only alternative, so there was no need for the trial judge to convene a jury.[15] *Id*. We proceeded to erroneously apply *Pham* where the supreme court held that a trial judge in a capital murder case was not required to reconvene the jury for sentencing when the State did not seek the death penalty. *Pham*, 716 So. 2d at 1103-04 (¶¶21-24). But the supreme court explicitly held in *Moore* that *Pham* does not control in cases involving juveniles. *Moore*, 287 So. 3d at 919 (¶55). In *Pham*, the adult defendant convicted of a capital offense faced only one alternative sentence (death); but for similarly situated juveniles, the supreme court said that more than one sentence is possible. *Id*. Thus, *Pham* did not apply in *Martin*. Because *Martin* was erroneously decided, it should not control in this case.

¶56. The majority cites paragraph 33 in *McGilberry II* for the proposition that section 99-19-101 does not apply in the context of a post-conviction relief proceeding where a defendant's sentence was final before *Miller*. *Ante* at ¶25. However, at that point in its opinion, the *McGilberry II* court was analyzing McGilberry's arguments concerning his *constitutional* rights, not his *statutory* rights. *See McGilberry II*, 292 So. 3d at 206-07 (¶¶30-32). In critiquing our Court of Appeals decision that the supreme court was reversing, the

---

[15] If anything, this statement merely highlights the fact that Martin was placed in exactly the position that *Miller* sought to remedy, namely a juvenile who was automatically sentenced to life without parole by operation of a statute.

supreme court stated, "Section 99-19-101 does not address the scenario before us—the resentencing of a juvenile offender based on the *constitutional* requirements of *Miller*." *Id*. at 207 (¶33) (emphasis added). Indeed, in paragraph 34 of *McGilberry II* that followed, the supreme court underscored the continuing obligation to provide at least one jury sentencing under the statute, saying:

> To be sure, as a capital offender, McGilberry had a statutory right to be sentenced by a jury. *See Moore v. State*, 2017-KA-00379-SCT, 287 So. 3d 905, 919-20 (Miss. May 30, 2019) (clarifying that Section 99-19-101 "requires all capital offenders-—without exception—to be sentenced by a jury"), *reh'g denied and opinion modified* (Miss. Sept. 12, 2019). And this right was indeed provided to him. In compliance with Section 99-19-101, upon his conviction of four counts of capital murder, the trial court conducted a separate sentencing hearing before a jury, which sentenced McGilberry to death. *See McGilberry*, 741 So. 2d 894 [(Miss. 1999)] (affirming McGilberry's death sentence). So in contrast to *Moore*, Section 99-19-101 has not been violated.

*Id*. at (¶34). The supreme court clearly was upholding McGilberry's (and any other juvenile capital offender's) *statutory* right to a jury sentencing, which would include Booker.

¶57. Because Booker never received sentencing by a jury as required under section 99-19-101 and confirmed by Mississippi Supreme Court precedent, I would deny the motion for rehearing, reverse Booker's sentence, and remand for further proceedings.

**WESTBROOKS, J., JOINS THIS OPINION.**

31